IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TINA M. MILLER, | ) |
| | ) |
|           Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 13-cv-898-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
|           Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Tina M. Miller seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI in February, 2010, alleging disability beginning on February 25, 2007. (Tr. 12). After holding an evidentiary hearing, ALJ Mary Ann Poulose denied the application in a written decision dated April 11, 2012. (Tr. 12-27). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This matter was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 21.

1

Plaintiff filed a Motion for Summary Judgment at Doc. 26.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to include all limitations supported by the evidence in her assessment of plaintiff's residual functional capacity.

2. The ALJ failed to properly evaluate plaintiff's credibility.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

With regard to plaintiff's application for DIB, plaintiff must establish that she

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

was disabled as of her date last insured. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work

3

experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Miller was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant

4

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Poulose followed the five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of degenerative disc disease of the cervical and lumbar spine and myofascial pain/fibromyalgia. She further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1. **Agency Forms**

Plaintiff was born in 1971, and was 36 years old on the alleged onset date of February 25, 2007. She was insured for DIB through December 31, 2011. (Tr. 199).[3]

Plaintiff had previously worked as a laborer in a factory. (Tr. 192).

In April, 2010, plaintiff filed an Activities of Daily Living Report. She said she lived with her family. She took her daughter to school in the morning and picked her up in the afternoon. Her mother prepared meals and did most of the shopping. Plaintiff said she did no housework or yard work. She said she could lift no more than 20 pounds and could walk for 15 minutes before needing to rest. She could pay attention as long as she was not in excruciating pain. Bending was painful and she could only stand "for so long." Sitting caused her back pain to increase. She suffered from depression, and was taking medicine for anxiety and depression. (Tr. 239-250).

In September, 2010, plaintiff reported that she could lift less than 20 pounds and could walk for only 2 blocks. She said that she had difficulty with standing, sitting, walking, and reaching. (Tr. 261-272). She said she could sit for about an hour. On a bad day, she was in bed all day. (Tr. 272).

In a later report, plaintiff said that her depression and anxiety were getting

---

[3] The date last insured is relevant only to the claim for DIB.

worse. She could not sit or stand for more than half an hour. She "lay in bed most days" because of depression. (Tr. 289-292).

   2.   **Evidentiary Hearing**

Ms. Miller was represented by an attorney at the evidentiary hearing in January, 2012. (Tr. 36). She testified that she lived with her parents and her daughter, who was 10. On some days, she was unable to get out of bed to take her daughter to school. Plaintiff said she was able to cook small things, but was unable to make a whole meal. She could not wash dishes. She needed help to do laundry. She could go grocery shopping, but walking around the store caused her back pain. She could not lift a 16 pound bag of cat food. She could lift a gallon of milk with difficulty. She could sit in a regular chair for about half an hour. Sitting caused her whole back to ache. (Tr. 42-47). She had no problems with her arms. (Tr. 50).

On a typical day, she took her daughter to school, then went back to bed with a heating pad for about 3 hours. She would then lay in bed with her feet propped up until it was time to pick her daughter up. She helped her daughter with homework. (Tr. 48-49).

She was taking Topiramate for migraine headaches. She had a headache every day. She also took Klonopin to help her sleep. Her psychiatrist prescribed Zyprexa, Effexor and Wellbutrin. She had no side effects from her medications. Plaintiff testified that she cried at everything and got mad really quickly. (Tr. 50-53). She had tried shots in her back and physical therapy, but they did not help. (Tr. 54).

With regard to headaches, Ms. Miller testified that, if she did not take Excedrin Migraine, her headache would progress into a full-blown migraine accompanied by nausea and light sensitivity. She would have to lie down in a dark room. This might last for days, and she would have to go to the hospital and get a shot. (Tr. 55-56).

Ms. Miller testified that she had fibromyalgia, which flared up when she got overly excited or mad. After one of these attacks, she could not get out of bed. (Tr. 59-60).

A vocational expert (VE) testified that plaintiff's past relevant work as a factory laborer was heavy and at the low end of semi-skilled. The ALJ asked her to assume a person who was able to do work at the light exertional level, limited to only occasional climbing, crouching, crawling, stooping and kneeling, at the unskilled level, with a sit/stand option. The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do. Examples of such jobs are label coder, mail clerk and cleaner-polisher. (Tr. 62-63).

### 3. Medical Treatment

Ms. Miller was working as a cashier in a convenience store in February, 2007. She fell while mopping a floor at work on February 27, 2007. Dr. Sandra Tate examined her on June 28, 2007, at the request of the workers compensation insurance company. Dr. Tate reviewed medical records which indicated that Ms. Miller had been diagnosed with a bulging disc at L4-5 in 1995. Surgery had been recommended, but was not done because she was pregnant. About 6 weeks after

she had her baby, her back problems were resolved and she returned to her factory job. She had been seen in the emergency room for headache in 2002. A CT scan of the brain was normal. Her past medical history included depression and anxiety. The records from her primary care physician at Brush Creek Medical Center indicated that she presented with discomfort in the low back and legs on March 30, 2007. An MRI showed a small broad-based central protrusion at L4-5 with no thecal sac encroachment or foraminal narrowing, and a broad central protrusion at L5-S1 with some extension to the right neural foramina. Her primary care physician treated her with muscle relaxers, anti-inflammatory medication and prednisone. She was also treated by a chiropractor. On exam, Dr. Tate found tenderness in the lumbosacral spine. Straight leg raising was negative. Sensation was intact in the upper and lower extremities. Muscle strength was full throughout. She had no tenderness or instability of the lower extremities. Gait and ambulation were normal. She had right SI joint dysfunction. Dr. Tate noted that there was no evidence of symptom magnification. She concluded that plaintiff could work with restrictions of no lifting greater than 30 pounds and no bending or twisting at the waist more than 4 times per hour. She anticipated that plaintiff would reach maximum medical improvement within 4 weeks with appropriate physical therapy. (Tr. 438-443).

Plaintiff had several epidural steroid injections in her lumbar spine beginning in October, 2007. (Tr. 405-408). She had a medial branch block at L3-L5 in July, 2008, which gave her some relief for about 2 months. In October, 2008, her pain had reoccurred. Dr. Reynaldo Pardo recommended that she

undergo radiofrequency neurotomies. (Tr. 390-391). Dr. Pardo performed radiofrequency neurotomies at medial branches at L2-5 on November 14, 2008. (Tr. 380-381).

Dr. Pardo prescribed physical therapy for right perithoracic/parascapular pain in December, 2008. Plaintiff told the physical therapist that her low back pain was gone, but she was noticing pain in her upper back, between her shoulders. She told the physical therapist that she was able to do her activities of daily living, but constant or repetitive movement of her arms caused her upper back pain to increase. On exam, she was able to perform upper extremity movements "within functional limits bilaterally." She was to receive physical therapy 3 times a week for 4 weeks, and was given a home exercise program. (Tr. 551-554).

Ms. Miller returned to Dr. Pardo in January, 2009. She reported that she had "near complete relief of her paralumbar pain" since the radiofrequency neurotomies, and she had good improvement in her ability to stand and ambulate. However, she had a new complaint of right paracervical pain with right upper extremity numbness and subjective weakness. On exam, she had minimal tenderness in the back, with no trigger points in the parascapular area. She had a full range of motion of the arms, and sensory exam was intact to pinprick from C5 to T1. (Tr. 539). An MRI of the cervical spine showed diffuse cervical desiccation. There was no disc herniation and no central spinal canal stenosis or foraminal narrowing. (Tr. 425). She underwent intra-articular facet injections and epidural steroid injections in the cervical spine. (Tr. 514, 521).

Ms. Miller returned to Dr. Pardo in June, 2009. She reported that she had

"complete relief of her neck and shoulder pain." However, her lower thoracic and upper lumbar pain had returned. She denied radicular symptoms in her lower extremities. Dr. Pardo recommended physical therapy. (Tr. 511).

Ms. Miller was evaluated for physical therapy on June 11, 2009. Four goals were identified. She was to be seen 2 to 3 times a week for 4 weeks. She attended only 6 sessions. She was discharged on July 22, 2009, having met 3 of her 4 goals. (Tr. 504-509).

On July 16, 2009, plaintiff reported to Dr. Pardo that she had fallen about 2 weeks earlier, and she was having pain in the mid-sacrum. Dr. Pardo recommended the use of ice compresses and anti-inflammatories. (Tr. 501).

In February, 2010, Ms. Miller began seeing Dr. Ghalambor, who practiced with Dr. Pardo. She complained of pain in the lumbar and lower thoracic regions. On exam, she had tenderness in the bilateral paravertebral and lower thoracic regions. Straight leg raising and Patrick's sign were negative. A recent nerve conduction study was negative for neuropathy or radiculopathy in the lower extremities. Dr. Ghalambor recommended a diagnostic medial branch block and radiofrequency lesioning. (Tr. 488-489). The medial branch block was done on February 11, 2010, and resulted in 70% relief of her low back pain. (Tr. 471-472). Radiofrequency lesioning of the medial branches was done in February and March, 2010. (Tr. 447-449, 459-461).

Plaintiff began seeing primary care physician Shadi Altwal, M.D., in May, 2010. He diagnosed narcotics addiction and advised her to stop all medications and to follow-up with a chronic pain management clinic. (Tr. 824). A lumbar

11

spine MRI done on May 24, 2010, showed a mild posterior disc bulge at L4-5 with a central posterior annular tear, and a mild diffuse posterior bulge at L5-S1.  (Tr. 873-874).

On June 22, 2010, Dr. Vittal Chapa performed a consultative physical examination.  He found that Ms. Miller had a normal gait.  She had no motor weakness or muscle atrophy.  Sensory examination was normal.  Her reflexes were symmetric.  There was no redness, heat, swelling or thickening of any joints.  She had no paravertebral muscle spasms.   Plaintiff's handgrip was normal on both sides, and she could do both fine and gross manipulations with both hands.  Straight leg raising was negative and the range of motion of all joints was full.   Dr. Chapa observed that there was "no evidence of lumbar radiculopathy."  (Tr. 837-840).

A nurse practitioner in Dr. Altwal's office saw her in July, 2010.  Ms. Miller said she was out of pain pills, but the nurse noted that she should have at least 40 pills left.  (Tr. 880).

In August, 2010, Ms. Miller complained to Dr. Ghalambor of worsening back pain and a feeling of weakness.  He noted that prior nerve conduction studies of the lower extremities were normal.  On exam, motor strength was 4+/5 and symmetric.  Sensory examination was normal.  (Tr. 868).

Dr. Ghalambor prescribed another round of physical therapy in response to plaintiff's complaints of low back pain in February, 2011.  His exam showed that flexion and extension were slightly limited and straight leg raising was negative.  Sensory exam was symmetric and motor strength was 4+/5.  (Tr. 961-962).

Upon initial evaluation, the physical therapist noted that Ms. Miller was limited to lifting 15 to 20 pounds. She was discharged from therapy in April, 2011, having met all her goals. The goals included decreased complaints of pain to between 0 and 2 on a scale of 1 to 10. (954-959).

Plaintiff went to the emergency room in June, 2011, complaining of persistent headache, back pain and chest pain. Recent cardiac work-up had been negative, and a recent MRI of the brain was unremarkable. She was ambulatory with a steady gait. On exam, her back and neck were non-tender and she had a normal range of motion. She was discharged to home in improved condition with a small narcotic prescription for the weekend. (Tr. 923-937).

Plaintiff received mental health care from Dr. Linda Hungerford. On December 15, 2011, Dr. Hungerford completed a report assessing her mental limitations. She indicated that Ms. Miller had no work-related mental limitations. (Tr. 1099-1101).

In August, 2011, Ms. Miller was seen by a nurse practitioner from the Spine Institute. She complained of pain in the low back with associated numbness and tingling. On exam, she had tenderness in the low back and straight leg raising increased her back pain. She could squat and arise, but could not toe or heel walk. Forward and backward bending were very limited. The assessment was cervical and lumbar degenerative disc disease. Surgery was not recommended. (Tr. 1085-1086). She returned to the Spine Institute in January, 2012, for further treatment of her back pain. She indicated that she had been seen by a neurologist for neck pain and headaches, but the transcript does not contain records of a

neurological consultation. She was given one prescription for Hydrocodone and told that she would have to go elsewhere for management of her chronic pain. (Tr. 1130).

## Analysis

Plaintiff first argues that the ALJ erred in assessing her RFC because she should have included additional limitations that are supported by her testimony and by the medical records. Many of the medical records she cites are notations of her subjective complaints. As this argument relies heavily on the credibility of her own statements, the Court will first consider her argument regarding the ALJ's credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3. Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's

14

testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff argues that the ALJ based her credibility determination on the lack of objective support in the medical records, but, according to plaintiff, the medical records document "severe cervical and lumbar impairments which can reasonably be expected to produce the pain" she alleged. Doc. 27, p. 16. Notably, plaintiff does not argue that the medical records support her claims of severe migraines or mental limitations. Plaintiff's argument ignores the many reasons the ALJ gave for her credibility determination.

The ALJ is required to give "specific reasons" for her credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Plaintiff's argument is short on specifics and ignores the fact that ALJ

Poulose gave specific reasons for her conclusion that plaintiff's allegations were not credible. First, she explained that plaintiff's allegations are not supported by objective medical evidence. Plaintiff stresses the fact that MRI studies of her cervical and lumbar spines showed degenerative disc disease and bulging discs at L4-5 and L5-S1. The ALJ obviously acknowledged the results of these studies. The flaw in plaintiff's argument is that she points to no medical evidence establishing that the MRI results translate into more serious limitations than those assessed by the ALJ. As the ALJ noted, the limitations placed on Ms. Miller by her healthcare providers would allow her to perform work at the light level. Further, plaintiff ignores the fact that not all of the objective evidence supported her allegations. In particular, as the ALJ pointed out, the EMG and nerve conduction study showed no evidence of radiculopathy.

      Further, the ALJ gave a number of other reasons for her conclusion that Ms. Miller's allegations were not credible. Plaintiff claims to have been totally disabled since February 25, 2007. However, when Dr. Tate examined her in June, 2007, she concluded that plaintiff could work with restrictions of no lifting greater than 30 pounds and no bending or twisting at the waist more than 4 times per hour. At her initial physical therapy evaluation, she reported that she was able to perform activities of daily living and the examination showed that she had a normal gait and her range of motion was within functional limits. The physical therapy records reflect that she made progress and met most of the goals of therapy. When she was discharged from therapy in April, 2011, she had met all goals and had a weight limit of 15 to 20 pounds. As the ALJ pointed out, this weight limit would permit

16

her to perform light work. Further, Dr. Chapa's consultative examination was essentially normal.

It is clear that the ALJ considered the relevant factors. Plaintiff does not take issue with the validity of any of the reasons given by the ALJ.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008). Here, the analysis is far from patently wrong.

An ALJ's credibility analysis will be upheld "if the ALJ provided specific reasons for discrediting the claimant's testimony." *Ronning v. Colvin*, 555 Fed.Appx. 619, 623 (7th Cir. 2014). Here, the ALJ gave specific reasons. It is evident that ALJ Poulose considered the appropriate factors and built the required logical bridge from the evidence to her conclusions about plaintiff's testimony. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Therefore, her credibility determination stands.

Plaintiff's only other point can be swiftly disposed of. She argues that the ALJ failed to include all of her limitations in the assessment of her RFC.

RFC is "the most you can still do despite your limitations." 20 C.F.R. §1545(a). In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Ibid.* Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

17

With regard to the medical records, plaintiff cites mostly to notes recording her subjective complaints. For the reasons set forth above, the ALJ was not required to credit these subjective complaints, and her analysis of plaintiff's credibility is not erroneous. In addition, she cites the results of her lumbar and cervical MRI studies. However, as was explained above, there is no medical evidence in the record to support the inference that the MRI results translate into additional functional limitations, and the Court cannot make such an assumption. "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).

In the final analysis, plaintiff's arguments are a plea to the Court to reweigh the evidence, which is far beyond this Court's proper role. The most that can be said is that reasonable minds could differ as to whether Ms. Miller was disabled during the relevant time period. In that circumstance, the ALJ's decision must be affirmed if it is supported by substantial evidence. And, the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Poulose committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, plaintiff's Motion for Summary Judgement

**(Doc. 26)** is **DENIED**. The final decision of the Commissioner of Social Security denying Tina M. Miller's application for disability benefits is **AFFIRMED**.

The Clerk of Court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

DATE:   December 9, 2014.


<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

19